IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA

v.  CRIMINAL NO. 3:23-cr-123-CWR-ASH

JUSTIN BRYCE BROWN

**RESPONSE OF UNITED STATES TO
DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

COMES NOW the United States Attorney, by and through his undersigned assistant, and files this Response of the United States to Defendant's Motion to Dismiss the Indictment [24]. Defendant Brown contends that 18 U.S.C. § 922(o) is unconstitutional facially and as applied to Brown. For the following reasons, the Brown's Motion should be denied:

**FACTUAL BACKGROUND**

On April 18, 2019, U.S. Customs and Border Patrol ("CBP") Agents in Memphis, Tennessee intercepted a package that was intended for delivery to Brown at his home address of 154 Brown Homestead Road, Mendenhall, Mississippi 39114. CBP Agents discovered that the package contained multiple machinegun conversion devices. CBP Agents then contacted the U.S. Department of Homeland Security Investigations ("HSI") in the Southern District of Mississippi.

On April 19, 2022, HSI was made aware of fifty-five (55) international packages with a Bill-Consignee-Address of 154 Brown Homestead Road, Mendenhall, MS 39114 with arrival dates between December 10, 2013, and April 9, 2022. Of these 55 international packages, forty-eight (48) packages listed with arrival dates from March 14, 2017, to April 9, 2022, were shipped from China. One of these packages is the package that was seized by

CBP on April 18, 2022. HSI was also made aware that six (6) of the 48 international packages listed with arrival dates from March 14, 2017, to April 9, 2022, were shipped from "Xie Fenghua X Xie" with the address 609 Jiang Xia, Guangzhou, Gua, CN 510430 and were manifested as "BICYCLE PIN PARTSMATERIALSTAINLESSU~SED FOR SAMP" and/or "BICYCLE ADAPTER PARTSMA~TERIALSTAINLESSUSED FOR," or words to that effect. Through related HSI investigations into the delivery of machinegun conversion devices into the United States from China, Agents knew that MCDs were often disguised as "bicycle parts" online for purchase from overseas sellers.

Agents applied for and were granted a search warrant for Brown's residence in Mendenhall, Mississippi. HSI Agents and U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Agents executed a search warrant at Brown's home on May 3, 2022. During the execution of the search warrant, HSI agents found Brown at the residence. While searching, they recovered several firearms, including the machinegun described in the indictment. The machinegun was identified as an "NFA Whore, Whore-16, .300 Blackout Rifle." The machinegun:



The machinegun had three separate positions for the selector switch on the lower receiver of the firearm. One selector position was titled: "MARY." MARY was the safe position—meaning that the firearm would not engage the firing pin if the trigger were pulled. The second selector position was titled: "SLUT." SLUT meant that the trigger, when engaged by a pull of the trigger, would fire a single round and function as a semiautomatic rifle. The third, and problematic selector position was dubbed "WHORE," meaning that the firearm would function as a machinegun and fire more than one round with a single pull of the trigger. The lower receiver of Brown's machinegun:



This firearm was confirmed by ATF analysis to be a machinegun within the definition of Title 18, United States Code, Section 921(a) and, by reference, Title 26, United States Code, Section 5845(b). ATF Firearms Enforcement Officer Christopher Cochran examined the firearm and determined that it is a machinegun capable of firing more than one round with a single pull of the trigger. His detailed findings have been provided to

the Defense and notice has been provided of his anticipated expert testimony.

Brown was indicted on December 13, 2023.

## LEGAL STANDARD

A party may raise by pretrial motion "any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). That includes a motion to dismiss for "a defect in the indictment." *Id*. 12(b)(3)(B). Dismissing an indictment is an "extraordinary and unusual relief" as it "encroaches upon the fundamental role of the grand jury." *United States v. Cage*, 2022 WL 17254319, at *1 (S.D. Miss. Nov. 28, 2022) (citing *United States v. Cockerham*, 2022 WL 4229314, at *1 (S.D. Miss. Sept. 13, 2022)). The propriety of such a motion turns on whether the defect involves a question of law or fact. *United States v. Fontenot*, 665 F.3d 640, 644 (5th Cir. 2011). If it involves a question of law, the Court may consider the motion. *Id*.

## LEGAL ARGUMENT

1. ***Bruen* did not unequivocally overrule *Hollis* and existing Fifth Circuit precedent forecloses Defendant's Second Amendment challenge.**

Binding precedent already holds that Section 922(o) is constitutional. *See Hollis v. Lynch,* 827 F.3d 436, 451 (5th Cir. 2016). Such Fifth Circuit holdings remain controlling. As the Fifth Circuit has explained: "We are bound by our precedent unless the Supreme Court or our *en banc* court has changed the relevant law." *United States v. Leontaritis*, 977 F.3d 447, 451 n.1 (5th Cir. 2020), *cert. denied,* 142 S.Ct. 335 (2021). "'[F]or a Supreme Court decision to override a Fifth Circuit case, the decision must unequivocally overrule prior precedent.'" *Gahagan v. United States Citizenship & Immigr. Servs.*, 911 F.3d 298, 302 (5th Cir. 2018)

4

(quoting *United States v. Petras*, 879 F.3d 155, 164 (5th Cir. 2018)). Faithful adherence to controlling precedent "is 'a foundation stone of the rule of law.'" *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 455 (2015) (quoting *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 798 (2014)). Finally, "a district court is not free to overturn Fifth Circuit precedent, even if the Supreme Court has implicitly overruled that precedent." *United States v. Brown*, No. 3:18-cr-117, 2024 U.S. Dist. LEXIS 43054, *3 (S.D. Miss. Mar. 12, 2024) (internal punctuation and quotations omitted).

Therefore, to reach the merits of the Defendant's motion, this Court must determine whether *Bruen* unequivocally overruled *Hollis*. In short, it did not. Therefore, the Defendant's motion must be denied.

Before *Bruen*, the Fifth Circuit applied a two-step inquiry when evaluating firearms regulations, asking first if the conduct was protected by the Second Amendment and then applying a means-ends scrutiny test if it did. *See United States v. Rahimi*, 61 F.4th 443, 450-52 (5th Cir. 2023) ("After *D.C. v. Heller,* 554 U.S. 570 […] (2008), courts coalesced around a similar 'two-step inquiry'"); *see also United States v. Jackson*, 2024 U.S. Dist. LEXIS 47111, **28-29 (N.D. Miss. Mar. 18, 2024. *Bruen* only eliminated the second step. *Rahimi*, 61 F.4th at 450 (holding that *Bruen* expressly repudiated the circuit courts' application of means-end scrutiny at the second step). Thus, when evaluating firearms regulations, *Bruen* requires courts to ask in the first instance, "does the challenged law regulate conduct that the plain text of the Second Amendment protects." 142 S.Ct. at 2127-30. Only if the answer is yes, does the Court turn to the analysis of historical analogues. *Id*. *See also Jackson*, 2024

5

U.S. Dist. LEXIS 47111, at **28-29. Furthermore, in deciding *Bruen*, several justices went to great lengths to explain that they did nor read *Bruen* as altering prohibitions on carrying dangerous and unusual weapons. 142 S.Ct. at 2157, 2167. As Justice Alito explained:

> Our holding decides nothing about who may lawfully possess a firearm … Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything we said in *Heller* or *McDonald v. Chicago* … about restrictions that may be imposed on the possession or carrying of guns.

142 S.Ct. at 2157. Similarly, Justice Kavanaugh and the Chief Justice pointed to the Court's prior decisions which held that the Second Amendment only protects those firearms in common use and not dangerous and unusual weapons. *Id*. at 2162.

The Fifth Circuit's decision in *Hollis* did not rely on the means-end scrutiny analysis rejected by *Bruen*. 827 F.3d at 451. Instead, *Hollis* rejected a challenge to a prohibition on machine guns at step one of the analysis. *Id*. The Court explained: "Machineguns are dangerous and unusual and therefore not in common use. They do not receive Second Amendment protection, so we uphold Section 922(o) at step one of our framework." *Id*. Thus, it is unsurprising that the Fifth Circuit recently held in *United States v. Loyola,* 2024 U.S. App. LEXIS 5726 (Mar. 10, 2024) (per curiam), that a defendant could not show "error in the straightforward application of existing cases" in the context of his claim that Section 922(o) was unconstitutional in light of *Bruen*. *Id.*

Therefore, because the Defendant in this case cannot show that *Hollis* was unequivocally overruled by *Bruen*, this Court must deny the pending motion.

### 2. Prohibiting the possession of machineguns is consistent with the nation's history of firearm regulation.

Assuming this Court wishes to reach the second prong of the *Bruen* test, the Defendant's motion still fails. The Second Amendment provides: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Like most rights, however, the Second Amendment right is "not unlimited." *Heller*, 554 U.S. at 626.

Supreme Court caselaw recognizes one important limitation on the Second Amendment right: Not all firearms are "arms" protected under the Second Amendment. *See United States v. Miller*, 307 U.S. 174, 178 (1939) ("In the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument."); *see also Heller*, 554 U.S. at 623 (recognizing that "the Second Amendment right, whatever its nature, extends only to certain types of weapons"); *Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016) (reiterating one of *Heller's* important limitations on the right to keep and bear arms—i.e., the historical tradition of prohibiting the carrying of dangerous and unusual weapons). As the Supreme Court explained in *Heller*—and reiterated in *Bruen*—the Second Amendment only extends to firearms that are "possessed at home" and "in common use at the time for lawful purposes like self-defense." *Heller*, 554 U.S. at 621-27; *see Bruen*, 142 S. Ct. at 2143 ("[W]e explained [in *Heller*] that the Second Amendment protects only the carrying of weapons that are those 'in

7

common use at the time,' as opposed to those that 'are highly unusual in society at large.'") (quoting *Heller*, 554 U.S. at 629).

Following *Heller* and *Miller's* clear instruction that the Second Amendment does not extend to all firearms, this Court's caselaw holds that no protection extends to firearms that are both "dangerous and unusual." *Hollis*, 827 F.3d at 447 (quoting *Heller*, 554 U.S. at 627). And as explained above, this Court has expressly addressed the type of firearm at issue here, holding that machineguns are both dangerous and unusual. *Id*. at 451. So, the government can regulate the possession of machineguns without trenching on the Second Amendment. *Id*. ("Machineguns are dangerous and unusual and therefore not in common use. They do not receive Second Amendment protection.").

The Fifth Circuit's decision in *Hollis* accords with the holding of every other Circuit that has considered whether machineguns warrant Second Amendment protection. *See United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*, 822 F.3d 136, 141-44 (3d Cir. 2016) (holding that "the Second Amendment does not protect the possession of machine guns. They are not in common use for lawful purposes."); *United States v. Henry*, 688 F.3d 637, 639-40 (9th Cir. 2012) (same); United States v. Fincher, 538 F.3d 868, 873-74 (8th Cir. 2008) (same); *see also Hamblen v. United States*, 591 F.3d 471, 473-74 (6th Cir. 2009) (explaining the right to keep and bear arms does not authorize an unlicensed individual to possess unregistered machine guns for personal use). These holdings are unsurprising given that machineguns are much rarer than semiautomatic pistols and rifles—and much more dangerous. "Machine guns possess a firepower that

8

outstrips any other kind of gun." *United States v. Kirk*, 105 F.3d 997, 1001 (5th Cir. 1997) (en banc) (per curiam) (Higginbotham, J., concurring). "A modern machinegun can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds." *Henry*, 688 F.3d at 640. "Short of bombs, missiles, and biochemical agents," there are "few weapons that are more dangerous than machine guns." *Id.*; *see also United States v. Lopez*, 2 F.3d 1342, 1356 (5th Cir. 1993) (classifying machineguns as "highly destructive, sophisticated weapons").

*Hollis's* holding—that machinegun possession is not conduct protected by the Second Amendment—also accords with *Heller* and *Bruen*, which teach that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes" and that "self-defense" is "the central component" of the Second Amendment's right. *Heller*, 554 U.S. at 599, 625; *see also Bruen*, 142 S. Ct. at 2128-29 (reaffirming Heller's use of constitutional text and history to set "the outer limits of the right"). While machineguns are sometimes used for lawful purposes (i.e., shooting at a target), they are not the type of gun typically possessed for traditionally lawful purposes, such as self-defense within the home. Rather, machineguns are "primarily weapons of war and have no appropriate sporting use or use for personal protection." *United States v. Jennings*, 195 F.3d 795, 799 n.4 (5th Cir. 1999 (quoting S. REP. No. 90–1501, at 28 (1968)); *see also Haynes v. United States*, 390 U.S. 85, 86 (1968) (recognizing that machineguns are "weapons used principally by persons engaged in unlawful activities").

Defendant has not addressed this uniform wall of authority nor cited one holding within this Circuit finding that machineguns are protected under the Second Amendment. In sum, because machineguns are dangerous and unusual, their possession is not protected by the Second Amendment. *Hollis*, 827 F.3d at 451. Thus, the federal prohibition on machinegun possession—Section 922(o)—does not violate the Second Amendment. *Id.*

### 3. The Nation's history confirms that Section 922(o) is constitutional.

Defendant attempts to resist these courts' conclusions by arguing that the history of barring machineguns is limited and relatively recent. Dkt. 24 at 4. Even if this Court were to conclude that the Second Amendment protects possession of machineguns, Section 922(o) still does not violate the Second Amendment because the statute "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129–30. To assess "whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding," *Bruen* contemplated two avenues of inquiry: (1) a "straightforward historical inquiry" to search for, most relevant here, historical regulations similar to the modern-day regulatory counterpart at issue or evidence that a comparable historical regulation was rejected on constitutional grounds; or (2) a "historical analogy," for instances where there is no such straightforward correspondence between the challenged law and predecessors. *Id.* at 2131-34. To address Defendant's challenge to Section 922(o), the "straightforward historical inquiry" that *Bruen* described suffices. *Heller* explained—and *Bruen* did not disturb—that this nation's

"historical tradition" includes "prohibiting the carrying of dangerous and unusual weapons." 554 U.S. at 637.

### A. Pre-Founding Analogues.

Because the Second Amendment "codified a right inherited from our English ancestors," English legal tradition sheds light on our traditions. *Bruen*, 142 S. Ct. at 2127-28 (quoting *Heller*, 554 U.S. at 599). In 1328, the Statute of Northampton made the offense of "rid[ing]" or "go[ing] armed" punishable by forfeiture of the offender's "armour." 2 Edw. 3, c. 3 (1328) (Eng.); *see Bruen*, 142 S. Ct. at 2139-2142. This statute was understood by commentators to provide that "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land." 4 William Blackstone, *Commentaries on the Laws of England* 148-49 (10th ed. 1787). In this way, the statute was consistent with the common law offense of "affray," which included cases "where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people." 1 Richard Burn, *The Justice of the Peace, and Parish Officer* 13-14 (2d ed. 1756); 1 William Hawkins, *A Treatise of the Pleas of the Crown* 135 (1716). The statute passed to the colonies, *Patterson v. Winn*, 30 U.S. (5 Pet.) 233, 241 (1831), and served as a model for later regulation, *see Bruen*, 142 S. Ct. at 2143.

### B. Founding Era Analogues.

The colonies likewise "prohibited the carrying of 'dangerous and unusual weapons.'" *Bruen*, 142 S. Ct. at 2143; *see Heller*, 554 U.S. at 627. The province of East New

11

Jersey (1686) prohibited the concealed carry of "unusual and unlawful weapons."[1] More generally, early American justice-of-the-peace manuals empowered justices to confiscate the arms of a person who "arm[ed] himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people."[2] Recodifying this authority, colonial Massachusetts (1692) and New Hampshire (1701) provided that justices of the peace could arrest "all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride, or go armed offensively . . . by night or by day, in fear or affray of their majesties' liege people."[3] In the late-18th century, the state of Virginia (1786) similarly provided that no person shall "ride armed by night nor by day, . . . in terror of the Country,"[4] and the commonwealth of Massachusetts (1795) later again directed justices of the peace to arrest "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth."[5] Although these statutes contemplated that an affray required

---

[1] An Act Against Wearing Swords, &c., ch. 9, *in* Aaron Leaming & Jacob Spicer, *Grants, Concessions, and Original Constitutions of the Province of New Jersey* 289-90 (2d ed. 1881).

[2] Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer*, 12-13 (1773) (Mass.); William Waller Hening, *The New Virginia Justice* 18 (1795) (Va.); Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22- 24 (2d ed. 1792) (N.H.); James Parker, *Conductor Generalis* 12 (1764) (N.J.); James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) (N.Y.); James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.).

[3] *See* Act of Nov. 1, 1692, ch. 18, § 6, *in* 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869); Act of June 14, 1701, ch. 7, *in* 1 *Laws of New Hampshire* 679 (Albert Stillman Batchellor ed., 1904).
[4] Act of Nov. 27, 1786, ch. 21, *in A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force* 33 (1794).

[5] Act of Jan. 29, 1795, ch. 2, 1795 Mass. Acts 436.

12

"something more" than merely carrying any firearm in public, *Bruen*, S. Ct. at 2145, they contemplated that it would naturally constitute affray to carry dangerous and unusual weapons, *see id.* at 2143.

For example, under English common law, "the offense of riding or going armed, with dangerous or usual weapons, [was] a crime." 4 W. Blackstone, Commentaries on the Laws of England 148–49 (1769). In the United States, courts long ago acknowledged that a man commits "an offence at common law" when he "arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people." *State v. Langford*, 3 Hawks 381, 383 (NC 1824). For that reason, the Second Amendment encompasses only arms "'of the kind in common use.'" *Heller*, 554 U.S. at 624 (quoting *Miller*, 307 U.S. at 179).

### C. Post-Founding Analogues.

Consistent with this tradition, States regularly banned various dangerous and unusual weapons through the antebellum period and during reconstruction. States continued to punish affray under the common law understanding that "[r]iding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land." Charles Humphreys, *A Compendium of the Common Law in Force in Kentucky* 482 (1822); John A. Dunlap, *The New-York Justice* 8 (1815) (reiterating that "at common law, for a man to arm himself with dangerous and unusual weapons, in

13

such manner as will naturally cause terror to the people" was affray); *see Heller*, 554 U.S. at 627 (collecting sources).[6]

And at a time when a firearm typically could not fire more than a single shot, States banned other dangerous and unusual weapons not designed for lawful use. States banned certain knives—most notably, the bowie knife, a knife with a distinctive hand guard that had a large fixed blade that was sharp on one side. Robert J. Spitzer, Understanding Gun Law History after Bruen: Moving Forward by Looking Back, 51 Fordham Urb. L.J. 58, 88-94 (2023).

Early versions of the Mississippi Code show that the regulation of deadly weapons through legislation is consistent with the Nation's historical tradition of firearm regulation.

The Mississippi Code of 1857 provided a prohibition for possessing a firearm while hunting on the Sabbath. *See* Revised Code of the Statute of Laws of the State of Mississippi, Section XLVIII, Art. 229 (1857). The Mississippi Code of 1880 provided a prohibition on possession of concealed weapons, including a "bowie knife, pistol, brass or metallic knuckles, [or] slung-shot." Campbell J.A.P. Revised Code of the Statute of Laws of the State of Mississippi, Chap. 77 § 2985 (1880).

The 1880 Mississippi Code further prohibited the transfer of a concealed weapon (including a pistol) to a minor, transfer of a concealed weapon (including a pistol) to any

---

[6] 3 Bird Wilson, *The Works of the Honourable James Wilson* 79 (1804); 1 William Oldnall Russell, *A Treatise on Crimes and Indictable Misdemeanors* 271-72 (1831); Henry J. Stephen, *Summary of the Criminal Law* 48 (1840); Ellis Lewis, *An Abridgment of the Criminal Law of the United States* 64 (1847); Francis Wharton, *A Treatise on the Criminal Law of the United States* 726 (1852); *State v. Langford*, 10 N.C. 381, 383-84 (1824); *O'Neill v. State*, 16 Ala. 65, 67 (1849); *English v. State*, 35 Tex. 473, 476 (1871); *State v. Lanier*, 71 N.C. 288, 289 (1874).

"person intoxicated," and possession of a concealed weapon (including a pistol) by a student of any university, college, or school. *Id*. at §§ 2986, 2987, and 2988.

The limitation on the possession of concealed deadly weapons continued into the amended Mississippi Code of 1892. *See* R.H. Thompson, et al. Annotated Code of the General Statute Laws of the State of Mississippi (1892). And again, when the Code was revised in 1906, the Mississippi Legislature preserved that prohibition:

> 1103. Deadly weapons; carrying of concealed (Laws 1898, p. 86).-Any person who carries concealed, in whole or in part, any bowie knife, dirk knife, butcher knife, pistol, brass or metallic knuckles, slungshot, sword or other deadly weapon of like kind or description, shall be guilty of a misdemeanor, and on conviction shall be punished by a fine of not less than twenty-five dollars nor more than one hundred dollars, or by imprisonment in the county jail not more than three months, or both, in the discretion of the court.

A.H. Whitfield Annotators et al. Mississippi Code of 1906 of the Public Statute Laws of the State of Mississippi, Chap. 28 § 1103 (1906). The 1906 Code further allowed for forfeiture of dangerous weapons used in violation of the Code:

> 1104. Weapon forfeited.-Upon the conviction of any person under the preceding section, the weapon shown in such case to have been carried concealed, in whole or in part, shall be forfeited to the state and shall be delivered to the sheriff of the county, who shall forthwith publicly destroy the same.

*Id*. at § 1104.

Moreover, the common-use limitation is consistent with the Second Amendment's prefatory clause: "The traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense." *Heller*, 554 U.S. at 624. *Heller* recognized that "[i]t may be objected that if weapons that are most useful in

[modern] military service—M-16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause" that refers to militias. Id. at 627-28. But *Heller* explained that "the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right." *Id*. at 628.

When machineguns became a "general societal problem" after World War I, many States banned them quickly without genuine "disputes regarding the lawfulness of such prohibitions." *Bruen*, 142 S. Ct. at 2131, 2133. As explained, the machinegun migrated from the battlefield to the civilian market following the war, and immediately caused a national crisis as criminals overpowered law enforcement officials with firearms like the Thompson submachine gun (or "Tommy Gun"). *See* John Ellis, *The Social History of the Machine Gun* 149-77 (1986). Shortly thereafter, States across the nation passed anti-machinegun laws, including bans.[7] *See* Robert J. Spitzer, *Understanding Gun Law History after Bruen*, supra, at

---

7 Act of June 5, 1925, ch. 3, 1925 W. Va. Acts 24-32; Act of May 16, 1927, ch. 552, § 1, 1927 Cal. Stat. 938; Act of Mar. 19, 1927, ch. 95, § 2, 1927 N.J. Laws 181; Act of Mar. 9, 1927, ch. 156, § 1, 1927 Ind. Acts 469; Act of Apr. 19, 1927, ch. 234, § 1, 1927 Iowa Acts 201; Act of Apr. 22, 1927, ch. 1052, § 4, 1927 R.I. Pub. Laws 257; Act of Apr. 27, 1927, ch. 326, § 1, 1927 Mass. Acts 413-14; Act of June 2, 1927, No. 372, § 3, 1927 Mich. Pub. Acts 888-89; Act of May 28, 1929, ch. 132, § 1, 1929 Wis. Laws 157; Act of Apr. 25, 1929, No. 329, § 2, 1929 Pa. Laws 777; Act of Apr. 29, 1929, ch. 190, § 1, 1929 Neb. Laws 674; Act of June 1, 1929, H.R. 498, § 1, 1929 Mo. Laws 170; Act of Feb. 25, 1931, ch. 249, § 1, 1931 Del. Laws 813; Act of Mar. 9, 1931, ch. 178, § 2, 1931 N.D. Laws 306; Act of Apr. 15, 1931, ch. 435, § 1, 1931 N.Y. Laws 1033; Act of July 2, 1931, § 2, 1931 Ill. Laws 452; Act of July 7, 1932, No. 80, § 2, 1932 La. Acts 337; Act of Feb. 28, 1933, ch. 206, §§ 1-5, 1933 S.D. Laws 245; Act of Mar. 6, 1933, ch. 64, § 1, 1933 Wash. Laws 335; Act of Mar. 10, 1933, ch. 315, § 3, 1933 Or. Laws 489; Act of Apr. 8, 1933, No. 64, 1933 Ohio Laws 189; Act of Apr. 10, 1933, ch. 190, § 3, 1933 Minn. Laws 233; Act of Apr. 27, 1933, No. 120, § 2, 1933 Haw. Laws 117; Act of Oct. 25, 1933, ch. 82, §§ 2-3, 1933 Tex. Laws 219; Act of Nov. 28, 1933, ch. 62, § 1, 1933 Kan. Laws 76; Act of Mar. 2, 1934, No. 731, §§ 2-4, 1934 S.C. Acts 1288; Act of Mar. 7, 1934, ch. 96, §§ 2-5, 1934 Va. Acts 137.

61-67 (2023); Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs 55, 67-68 (2017). This wealth of historical evidence supports that from the colonial era to today, the United States has consistently banned weapons that are not typically possessed by law-abiding citizens for lawful purposes.

*Bruen* did not change this aspect of *Heller*. Instead, *Bruen* reaffirmed *Heller's* conclusion that there is a "fairly supported" "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Bruen*, 142 S. Ct. at 2128 (citing 4 W. Blackstone, Commentaries on the Laws of England at 148-149; *Miller*, 307 U.S. at 179). In light of *Heller's* conclusion that our nation's historical tradition includes regulating dangerous and unusual firearms, this Court should reject Defendant's constitutional challenge to Section 922(o) on historical grounds, assuming it does not already conclude that the plain text of the Second Amendment does not cover the possession of machineguns.

## CONCLUSION

For the foregoing reasons, Defendant's Motion should be denied.

DATED:   November 12, 2024.

                              Respectfully submitted,

                              TODD W. GEE
                              UNITED STATES ATTORNEY

By:   */s/ Samuel Goff*
       SAMUEL GOFF (MSB#105813)
       Assistant United States Attorney
       501 E. Court Street, Suite 4.430
       Jackson, Mississippi 39201
       Phone: 601.965.4480

17

Email: Samuel.goff@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I have this day filed the foregoing with the Clerk of the Court using the electronic filing system, ("ECF"), which sent notification to all parties of record.

*/s/ Samuel Goff*
Assistant United States Attorney