IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br>  *Plaintiff*, <br><br> v. <br><br> **JUSTIN BRYCE BROWN**, <br><br> *Defendant*. | Cause No. 3:23-CR-123-CWR-ASH |

## ORDER

The government has charged Justin Bryce Brown with knowingly possessing a machinegun in violation of 18 U.S.C. §§ 922(o) and 924(a)(2). This Order resolves Mr. Brown's motion to dismiss.

*Background*

Section 922(o) makes it illegal to "possess a machinegun" unless that machinegun "was lawfully possessed before the date this subsection takes effect." 18 U.S.C. § 922(o). As Judge Broomes explained in *United States v. Morgan*, the statute "criminalizes the mere possession of such weapons without regard to how the possessor uses them." No. 23-10047-JWB, 2024 WL 3936767, at *4 (D. Kan. Aug. 26, 2024). "If an individual purchases such a weapon and locks it away in a gun safe in his basement for twenty years without touching it, he is just as guilty of a violation of § 922(o) as one who takes the same weapon out on the public streets and displays it in an aggressive manner." *Id.*

Section 924(a)(2), meanwhile, is the penalty statute. It says a person who knowingly possesses an unlawful machinegun can be fined, sent to federal prison for 10 years, or both fined and imprisoned. 18 U.S.C. § 924(a)(2).

Mr. Brown now asks the Court to dismiss the indictment. Because he has never been convicted of a felony, he argues that the Second Amendment protects him from criminal prosecution under these statutes. He is, in other words, bringing an "as-applied" challenge to his prosecution. *See United States v. Bullock*, 679 F. Supp. 3d 501, 509 (S.D. Miss. 2023).

Mr. Brown's argument was once foreclosed by decades of precedent. Not anymore. In 2022, the Supreme Court "established a new historical paradigm for analyzing Second Amendment claims." *United States v. Diaz*, 116 F.4th 458, 465 (5th Cir. 2024) (referencing *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022)). Every appellate court's "prior precedent" was rendered "obsolete." *Id.* (cleaned up).

Under the new standard, the government must prove that its desired firearm restriction—which here, means the statute criminalizing simple machinegun possession—is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 467 (quoting *Bruen*, 597 U.S. at 24).

> To satisfy this burden, the government must identify a well-established and representative historical analogue, not a historical twin. Evidence must be relevantly similar to the challenged law. In assessing similarity, we consider whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified.

*Id.* (cleaned up). This is a "heavy burden." *United States v. Daniels*, 124 F.4th 967, 973 (5th Cir. 2025).

The government found this out the hard way in *Morgan*. There, Judge Broomes observed that as Congress did not ban machinegun possession until 1986, the modern ban is inconsistent with history and tradition. 2024 WL 3936767, at *4. Even today, in fact, "it is perfectly legal for a person who has not been divested of his firearm rights under some other provision of law to acquire and possess a machinegun, so long as it was lawfully possessed by someone before the relevant date in 1986," and other provisions of federal law are followed. *Id.*

The government has appealed *Morgan*. It remains "an outlier." *United States v. Johnson*, No. CR 24-20083, 2024 WL 4612888, at *12 (E.D. Mich. Oct. 29, 2024); *see also United States v. Chan*, No. 22-CR-109-DKW, 2024 WL 4028019, at *6 (D. Haw. Sept. 3, 2024) (collecting cases arriving at the opposite conclusion). But outliers can nevertheless be instructive and correct, so long as they are faithful applications of the law. *See, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570, 621, 624 n.24 (2008) (rejecting hundreds of judicial opinions as "erroneous").

Outlier cases are also to be expected in the wake of *Bruen*. In that case, the Supreme Court instructed lower courts to decide Second Amendment challenges on the record presented by the parties, per "the principle of party presentation." *Daniels*, 124 F.4th at 977-78 (citing *Bruen*, 597 U.S. at 25 n.6). As there will be cases in which the government does a better job identifying historical analogues[1] or showing how a defendant's conduct fits into that history of regulation, *id.*, there will be cases in which the government does not do those things. Courts must consider each case on its own merits. *Id.* at 978.

---

[1] The Fifth Circuit itself may be splintering on the party presentation rule—or, at least, the appellate court has not yet articulated the exceptions to the rule. One panel recently found that the government can present its historical analogues for the first time on appeal, effectively sandbagging district courts, because matters of history are deemed "a legal inquiry." *United States v. Bullock*, 123 F.4th 183, 185 (5th Cir. 2024). *Bullock* is difficult to reconcile with *Daniels* and *Bruen* footnote six.

3

As the Fifth Circuit recently explained,

> We sympathize with the desire to articulate a bright-line rule that district courts could apply going forward. But, with due respect, . . . Second Amendment doctrine [will] develop more fully as more cases involving different fact patterns arise. A piecemeal approach to laws such as § 922(g)(3), determining the contours of acceptable prosecutions through the resolution of continual as-applied challenges, is what *Bruen* and *Rahimi* require. We decline to short-circuit that process now.

*Id.*

Following that guidance, the Court turns to the present case.

*The Government's Arguments*

In this matter, the government urges that a (partial) machinegun ban is lawful because American history and tradition has long prohibited firearms that are "both dangerous and unusual." Docket No. 25 at 8. "[M]achineguns are much rarer than semiautomatic pistols and rifles—and much more dangerous," it says. *Id.* "A modern machinegun can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds." *Id.* at 9. The government concedes that "machineguns are sometimes used for lawful purposes (i.e., shooting at a target)," but maintains that they can be banned because "they are not the type of gun typically possessed for traditionally lawful purposes, such as self-defense within the home." *Id.*

Most of the government's citations for these arguments are judicial decisions that predate *Bruen*. Many of its remaining claims, which focus on the benefits to public safety of a machinegun ban, are policy arguments entitled to no weight. *Bruen* held that "the Second Amendment does not permit . . . judges to assess the costs and benefits of firearms restrictions under means-end scrutiny." 597 U.S. at 23 (cleaned up).

4

The government does ultimately turn to history. Its recitation begins with the 1328 Statute of Northampton, which "made the offense of 'rid[ing]' or 'go[ing] armed' punishable by forfeiture of the offender's 'armour.'" Docket No. 25 at 11 (citation omitted). The government cites colonial American authorities for the proposition that a colony could incarcerate persons who "ride or go armed offensively, to the fear or terror of the good citizens." *Id.* at 12 (citation omitted). And it points to post-founding sources showing that a state could punish persons "going armed with dangerous or unusual weapons," as it would be "a crime against the public peace." *Id.* at 13 (citation omitted).[2]

These examples might support the prosecution of a person charged with terrorizing others with a machinegun. Yet they provide no support for the prosecution of Mr. Brown. The government does not allege that he did anything against the "public peace." Mr. Brown was not "armed offensively," nor was he attempting to terrorize the "good citizens." He wasn't going or riding anywhere.[3]

The government's brief instead admits that the machinegun was *in his home*. None of the government's proffered "historical regulations," however, are "relevantly similar" to criminalizing possession of a firearm in one's home. *Bruen*, 597 U.S. at 29. If anything, American history and tradition support Mr. Brown's possession of a firearm in his home.[4]

---

[2] The government adds a couple of pages about Mississippi's 19th century firearms prohibitions. It says that our State in that era prohibited "possessing a firearm while hunting on the Sabbath" and "possession of concealed weapons," among other things. Docket No. 25 at 14 (citations omitted). Such prohibitions are in stark contrast to Mississippians' modern understanding of the Second Amendment. More importantly, this Court is not sure how relevant 19th and 20th century cases are to deciphering what the 18th century founders were contemplating. The Second Amendment was enacted a quarter of a century before Mississippi joined the Union.

[3] Of course, no "armour" is sought to be forfeited in this criminal prosecution.

[4] "According to Blackstone, the home was valued highly enough in the cultural consciousness not only to be likened to a castle, a place where safety from enemies should be guaranteed, but also to confer a certain degree of immunity from the state." Benjamin Levin, *A Defensible Defense?: Reexamining Castle Doctrine*

5

*Bruen* nevertheless tells us that there is an American "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 626). That is the law to be followed. The ultimate problem for the government, then, is this: although machineguns are "dangerous," it does not explain how machineguns are *unusual*.

*"Dangerous"*

Revolvers satisfy the ordinary definition of the word "dangerous" because they are "likely to cause serious bodily harm." *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) (quoting Black's Law Dictionary). Yet they are legal for a law-abiding person to possess in their home. Cases like *Heller* and *McDonald* require judges to block local ordinances or state laws banning revolver possession. *See Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016) (per curiam) (declaring unconstitutional a state law prohibiting the possession of stun guns).

Semiautomatic weapons are arguably more dangerous than revolvers.[5] They too can *and do* cause serious bodily harm. *See Bianchi v. Brown*, 111 F.4th 438, 463 (4th Cir. 2024) (describing "ripples of fear reverberating throughout our nation in the wake of the horrific mass shootings in, for example, Las Vegas, Orlando, Blacksburg, Sandy Hook, Sutherland Springs, El Paso, Uvalde, Lewiston, Parkland, San Bernardino, Binghamton, Fort Hood,

---

*Statutes*, 47 Harv. J. on Legis. 523, 530 (2010). "A man's home is his castle," as the saying goes, and the Supreme Court's recent rulings have "effectively provided constitutional endorsement of the castle doctrine, which allows for a more expansive use of deadly force in self-defense in the home than in other places." Mary Anne Franks, *The Supreme Court As Death Panel: The Necropolitics of* Bruen *and* Dobbs, 98 N.Y.U. L. Rev. 1881, 1886 (2023). If the law permits deadly force in self-defense in the home, it is not clear how it can criminalize possession of the firearm used for that defense in the home. The use of the firearm necessarily requires that it first be possessed.

[5] *But see Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 409 (7th Cir. 2015) (observing that comparing the dangerousness of handguns versus assault weapons is difficult, since "nearly as many people are killed annually with handguns in Chicago alone as have been killed in mass shootings . . . nationwide in more than a decade").

Thousand Oaks, Virginia Beach, Washington, D.C., Aurora, Monterey Park, Pittsburgh, Geneva County, Boulder, Buffalo, Covina, Dayton, Red Lake, Roseburg, San Jose, Santa Fe, Allen, Charleston, Indianapolis, Manchester, Omaha, and Plano—each of which occurred in the 21st century and resulted in at least nine fatalities"). Yet millions of them, in both their handgun and long gun forms, are perfectly legal to possess.

Machineguns are even more dangerous. There's no dispute about that. *See Staples v. United States*, 511 U.S. 600, 611 (1994). But the above examples illustrate that dangerousness is not the end of the matter, because firearms can be dangerous and constitutionally protected. Instead, the government has the burden to prove that the firearm to be restricted is both dangerous *and* unusual.[6] *See Bruen*, 597 U.S. at 21.

That brings us to the second element.

### *"Unusual"*

The *Morgan* case raised by Mr. Brown says there were more than 740,000 machineguns lawfully possessed in the United States in 2021. 2024 WL 3936767, at *4 (citing ATF data). The government has not pointed to any other number. The Court accepts it as true.

Seven hundred and forty thousand is no small number.[7] The government presents no argument or explanation for why such a large figure is somehow not common. Merriam-

---

[6] About "dangerousness": The standard in this matter asks about the dangerousness of the firearm sought to be possessed, not the dangerousness of its possessor. To be clear, though, there is no record evidence that Mr. Brown is dangerous. He's never been convicted of a felony. More than four months passed between his indictment and his arrest, which suggests that he didn't pose any particular danger to public safety. And when he was ultimately arrested, the Magistrate Judge held the initial appearance and arraignment, and promptly released Mr. Brown on an unsecured bond. The government didn't object to his release. The government also did not oppose Mr. Brown's motion to travel outside of the district. For nine months, Mr. Brown has continued to live in the free world without any known concern.

[7] It is also just a floor. When lawful and unlawful machineguns are combined, our Nation has within its borders more than 740,000 of them.

Webster's dictionary defines common as, among other things, "widespread."[8] Three-quarters of a million of any kind of firearm is plainly widespread.

Instead of presenting a factual argument about commonality,[9] the government makes a legal argument. It finds support for Mr. Brown's prosecution in *Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016), a case in which the Fifth Circuit found § 922(o) constitutional. The government thinks the case is good law today, despite the Supreme Court's 2022 decision in *Bruen*.

In *Hollis*, the Fifth Circuit explained that courts determine the commonality of a firearm using methodological approaches, such as "raw number, percentage and proportion, [and] jurisdiction-counting."[10] *Id.* at 449. Applying that methodology to machineguns, the Fifth Circuit found that "Hollis does not have the numbers to support his claims." *Id.* at 450. For example, the ATF report that Hollis provided showed only "175,977 pre–1986 civilian-owned machineguns in existence." *Id.* at 449.

Readers have already noted the problem. The number of machineguns in *Hollis* differs from the factual record in our case by a factor of four. The source of the discrepancy is unknown but irrelevant, as an appellate decision finding that '$x$ number of firearms renders them common as a matter of law' does not answer whether $4x$ that number is also common.

---

[8] *Common*, Merriam-Webster Online (last visited Jan. 27, 2025).
[9] The closest the government gets to mounting such an argument is a passing mention that "machineguns are much rarer than semiautomatic pistols and rifles," before pivoting to compare machineguns to "bombs, missiles, and biochemical agents." Docket No. 25 at 8-9. "Much rarer," of course, isn't the standard. It also doesn't grapple with the present issue, since machineguns are less common than semiautomatic firearms and more common than biochemical agents.
[10] One circuit, for example, concluded that AR-15s are common because they account for 5.5 percent of all firearms in this Nation. *Hollis*, 827 F.3d at 449. Another circuit found that large capacity magazines are common because there are 50 million of them. *Id.* The Fifth Circuit also considered a concurrence in which two Justices argued that stun guns are common because there are 200,000 of them in America and 45 states accept them as legitimate forms of self-defense. *Id.* (citing *Caetano*, 577 U.S. at 420 (Alito, J., concurring)).

8

The change in every variable—"raw number, percentage and proportion"— renders our case distinguishable.[11] *Id.* The methodological approach must be redone.[12]

Here, the government made no attempt to present facts and figures. It placed all its eggs in one basket—the notion that *Hollis* is still good law. *Hollis*, however, may not be good law.

The Fifth Circuit says *Bruen* "render[s] our prior precedent obsolete." *Diaz*, 116 F.4th at 465. Obsolete means "no longer useful"[13] and "replaced by something newer."[14] The Fifth Circuit also tells us it has "abandon[ed] that prior precedent." *Id.* In other words, the appellate court has "give[n] up" and "withdraw[n] from" enforcing that precedent.[15] The government does not acknowledge or mention *Diaz*, even though it was available when the present motion was briefed. To the extent further confirmation is necessary, a Fifth Circuit decision issued after the briefing closed says *Hollis* was "abrogated." *Siders v. City of Brandon, Miss.*, 123 F.4th 293, 304 (5th Cir. 2024).

All this should end the discussion. If *Hollis* was abrogated, then the government has no footing to stand on. This Court cannot go looking for facts that have not been presented before it. The government has failed to meet its burden of establishing that machineguns are both dangerous *and* unusual. Under *Bruen*, it therefore cannot restrict Mr. Brown's possession of one in his home.

---

[11] Adding in the "jurisdiction counting" from *Hollis* compounds the difficulty, because it suggests that 38 States allow machinegun possession of some kind. *See* 827 F.3d at 450. We are above the 200,000 mark noted by Justices Alito and Thomas in *Caetano*, and close to the number of jurisdictions that they thought relevant to the inquiry.

[12] Stale facts are, of course, unworthy of deference. *See Shelby Cnty., Ala. v. Holder*, 570 U.S. 529 (2013).

[13] *Obsolete*, Merriam-Webster Online (last visited Jan. 27, 2025).

[14] *Obsolete*, Cambridge Dictionary Online (last visited Jan. 27, 2025).

[15] *Abandon*, Merriam-Webster Online (last visited Jan. 27, 2025).

One last argument bears mention: that machineguns cannot be deemed "common" because they weren't common in 1790s America. A non-lawyer might reasonably think that. But the Supreme Court has rejected the idea, holding that the Second Amendment protects more than just "musket and carbine." *Bruen*, 597 U.S. at 49; *see Heller*, 554 U.S. at 622. Thus, it is legal to own, possess, and use various semiautomatic and automatic weapons. It appears that although the Second Amendment's text is fixed, its application keeps up with the times. *See* Thurgood Marshall, *Reflections on the Bicentennial of the United States Constitution*, 101 Harv. L. Rev. 1, 5 (1987).

*Conclusion*

The age-old problem of judging is how to honor an individual's Constitutional rights and respect the will of a democratically-elected majority. We look to history to try and find a satisfying answer to that dilemma. But this Court has its doubts that the historical approach wielded in these recent Second Amendment cases is the right one. *See Bullock*, 679 F. Supp. 3d at 501.

*Bruen* specifically requires judges to follow "history and tradition," evaluate whether new laws are "relevantly similar" to past laws, and determine whether certain firearms are "dangerous and unusual." These tests are deeply concerning to many.[16] They will continue

---

[16] Take the "relevantly similar" test, for example. As the D.C. Circuit just explained, "there simply is no relevantly similar historical analogue to a modern, semiautomatic handgun equipped with an [extra-large capacity magazine]." *Hanson v. District of Columbia*, 120 F.4th 223, 240 (D.C. Cir. 2024). Judges can instead cherry-pick the historical analogues they wish, discarding contrary examples as "ambiguous" or "inconclusive." Antonin Scalia, A Matter of Interpretation 36 (1997). "[T]he trick is to look over the heads of the crowd and pick out your friends." *Id.* at 35-36. "Dangerous and unusual," meanwhile, merely combines two standardless words into one term. Everything is dangerous in the right (or wrong) circumstance; even water turns dangerous in a flash flood, at a TSA checkpoint, or on the floor of a grocery store. And who is to say a certain firearm is unusual? The test ultimately turns on a judge's view of data without deference to the other, more democratic branches of government.

10

to generate "confused and confusing lower court precedent." Jacob D. Charles, *The Dead Hand of A Silent Past:* Bruen*, Gun Rights, and the Shackles of History*, 73 Duke L.J. 67, 76 (2023).[17]

But step back from that for a moment.

At their core, the Supreme Court's recent Second Amendment cases are predicated upon a lack of trust. The *Heller*, *McDonald*, and *Bruen* decisions did not trust that local and state lawmakers had protected their citizens' Second Amendment rights, or would protect them going forward. The decisions also expressed doubt that federal courts were doing enough to protect those rights. *See Bruen*, 597 U.S. at 26. New boundaries were set. They used history as the first and most important test of legality, as if history would be a more trustworthy and reliable guide to constitutional law.

The ultimate irony is that the version of history endorsed in these (and other) decisions has itself been deemed untrustworthy by actual historians.[18] The experts don't think lawyers

---

[17] The confusion has persisted after *Rahimi*. *See* Madiba K. Dennie, *Federal Judges (Still) Have No Earthly Idea What to Do With the Supreme Court's Second Amendment Cases*, Balls and Strikes (Jan. 15, 2025) (collecting cases).

[18] It's true for *Heller*. "An overwhelming majority of historians" are unconvinced that the Second Amendment protects an individual right to bear arms. Patrick J. Charles, *The "Reasonable Regulation" Right to Arms: the Gun-Rights Second Amendment before the Standard Model*, *in* A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment 168 (Tucker, et al., eds., 2019).

It's true for *Bruen*. *See* Patrick J. Charles, *The Fugazi Second Amendment:* Bruen*'s Text, History, and Tradition Problem and How to Fix It*, 71 Clev. St. L. Rev. 623, 626-27 (2023); Albert W. Alschuler, *Twilight-Zone Originalism: The Peculiar Reasoning and Unfortunate Consequences of* New York State Pistol & Rifle Association v. Bruen, 32 Wm. & Mary Bill Rts. J. 1, 72 (2023).

It's true for *Dobbs*. *See* Joint Statement of the American Historical Association and the Organization of American Historians, *History, the Supreme Court, and* Dobbs v. Jackson, July 6, 2022 (calling *Dobbs* a "misinterpretation about the history of legalized abortion in the US" containing "misrepresentations" that do not meet "high standards of historical scholarship").

And it's true for *Trump*. *See* Organization of American Historians, *Statement on Supreme Court Decision in* Trump v. U.S., July 8, 2024 ("The U.S. Supreme Court has at best overlooked, and at worst abused, the evidence of the significance of the founding era in understanding our Constitution. Practitioners of American history need to call them out in the most public ways possible. With respect for historical evidence and argument, we dissent.").

Other times, later research proves the Court's take on history to be incorrect. *See* Jimmy Hoover, *UK Legal Scholars Track Down 17th Century Murder Case, Prove Supreme Court Wrong*, Nat'l L. J., June 14, 2023 (describing new research showing *Gamble v. United States* to be wrongly decided). The open question is

and judges have gotten it right.[19] And, unfortunately, the lack of trust inherent in these decisions cannot be untangled from the public's declining trust in Article III itself.[20]

As one of those tasked with applying these new tests, this Court understands the confusion. It feels the frustration. But its doubts and the discourse, no matter how serious or justified, cannot deter it from faithfully applying the law, even if that application is later found to be erroneous. *See United States v. Rahimi*, 61 F.4th 443 (5th Cir.), *rev'd*, 602 U.S. 680 (2024).

The controlling standard of the moment requires this Court to "determin[e] the contours of acceptable prosecutions through the resolution of continual as-applied challenges," based on the evidence and arguments before it. *Daniels*, 124 F.4th at 978. Under that standard, Mr. Brown's as-applied challenge is sustained. His motion is granted and the case dismissed.[21]

**SO ORDERED**, this the 29th day of January, 2025.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE

---

whether the judiciary will incorporate that new research into its conclusions the next time the issue is litigated.

[19] *See* Jonathan D. Martin, *Historians at the Gate: Accommodating Expert Historical Testimony in Federal Courts*, 78 N.Y.U. L. Rev. 1518, 1525 (2003).

[20] *See* David F. Levi et al., *Losing Faith: Why Public Trust in the Judiciary Matters*, 106 Judicature 71-77 (2022).

[21] This does not prevent the government from seeking to enforce § 922(o) in other matters, to the extent it can meet the applicable standard in them.